# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BLUE HERON BEACH RESORT**
**DEVELOPER, LLC,**

  **Plaintiff,**

**v.**                                                    **Case No:  6:13-cv-372-Orl-36TBS**

**BRANCH BANKING AND TRUST**
**COMPANY,**

  **Defendant.**

_____

**SCOTT RANDOLPH, ORANGE**
**COUNTY TAX COLLECTOR**

  **Intervenor-Defendant,**
  **Counterclaimant, and**
  **Crossclaimant,**

**v.**

**BLUE HERON BEACH RESORT**
**DEVELOPER, LLC,**

  **Counterclaim**
  **Defendant,**

**and**

**BRANCH BANKING AND TRUST**
**COMPANY,**

  **Crossclaim**
  **Defendant.**

_____

## <u>ORDER</u>

This cause comes before the Court on the motions for summary judgment filed by the

parties in this matter:  Blue Heron Beach Resort Developer, LLC's ("Blue Heron") Motion for

Summary Judgment (Doc. 58); Branch Banking and Trust Company's ("BB&T") Motion for Summary Judgment (Doc. 56); and Scott Randolph, Orange County Tax Collector's (the "Tax Collector") Motion for Summary Judgment (Doc. 53). Responses and replies to the motions for summary judgment were filed. Docs. 63–65, 67–70, 72–74. Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, stipulated facts, memoranda of counsel and accompanying exhibits, and for the reasons that follow, the motions for summary judgment will be granted in part and denied in part.

## I.   BACKGROUND

### A.   Statement of Facts[1]

#### 1.   The Blue Heron Tower Project and Litigation

Several years ago, Blue Heron obtained a loan from BB&T's predecessor-in-interest, Colonial Bank, for a large-scale condominium project known as Blue Heron Beach Resort Tower I and II in Orlando, Florida (the "Blue Heron Loan"). Doc. 66, Stipulation of Agreed Material Facts ("SAF") ¶ 1. The Blue Heron towers were expected to contain furnished condominiums which would be made available for sale to the public. *Id.* ¶ 2.

On August 14, 2009, the Alabama State Banking Department closed Colonial Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as the receiver to liquidate and distribute the assets of Colonial Bank. *Id.* ¶ 3. The same day, the FDIC entered into a purchase and assumption agreement with BB&T under which BB&T acquired certain assets of Colonial Bank, including the Blue Heron Loan. *Id.*

On December 1, 2009, Blue Heron filed suit against BB&T, as successor to Colonial Bank, in state court for breach of contract, fraudulent misrepresentation, and negligent misrepresentation

---

[1] The Court has determined the facts based on the parties' submissions, including stipulated facts, affidavits, and deposition testimony. Disputes concerning the facts are noted.

arising from Colonial Bank's alleged breach of an agreement to provide end-user financing to individuals who purchased the condominium units from Blue Heron. *Id.* ¶ 4.  On December 9, 2009, BB&T removed the case to this Court, and thereafter filed counterclaims against Blue Heron for foreclosure, breach of promissory notes, and breach of personal guarantees. *Id.* ¶ 5.

On October 2, 2010, Blue Heron (along with each of its members)[2] and BB&T entered into a Confidential Stipulation to settle that action. *Id.* ¶ 6; *see* Doc. 56-7 at 2–28 ("Confidential Stipulation").  The Confidential Stipulation provided that the parties would file a joint motion to remand the action to state court, and that upon remand, the parties would file an "Agreed Final Judgment of Foreclosure", pursuant to which 90 units of Blue Heron Beach Resort Tower II, including the personal property contained therein (collectively, the "Blue Heron Collateral"), would be sold at a public auction.  SAF ¶ 7; Confidential Stipulation ¶ 4(a)(1) & (b).  Paragraph 4(a) of the Confidential Stipulation—which includes the provision primarily at issue in this case, Paragraph 4(a)(7)—also provided for the following:

> (2) Payment by Obligors of $1,250,000 in immediately available funds, to be held in escrow in BB&T Account No. [ ] pursuant to an existing agreement dated May 5, 2010 between BB&T and Obligors ("Escrow Agreement"), but which upon the earlier of Closing[3] . . . or default by Obligors under this Stipulation shall be immediately applied by BB&T (pursuant to ¶ 5 of this Stipulation and without any consent or signed authorization of Obligors or any Escrow Agent, as defined in the Escrow Agreement, being necessary) to the indebtedness described in ¶ 3 above; and

---

[2] Fred W. Schinz, John T. Chain, Jr., J. Ron Rogers, and Les W. Burke were at all material times the sole members of Blue Heron, and they served as guarantors of the Blue Heron Loan. *See* Doc. 108, Exs. A–D; Confidential Stipulation ¶ 1(b).  The Confidential Stipulation referred to Blue Heron and the members collectively as the "Obligors".  *See* Confidential Stipulation at 1.

[3] The term "Closing" refers to the closing of the settlement following the fulfillment of the terms of the Confidential Stipulation, the foreclosure sale of the Blue Heron Collateral, and the issuance of a certificate of title to the winning bidder of the foreclosure sale.  *See* Confidential Stipulation ¶ 23.  Upon Closing, the funds set forth in Paragraph 4(a) would be disbursed to BB&T and the parties would file a stipulation dismissing the state court action.  *Id.*

(3) Obligors' joint written authorization to BB&T, permitting the unconditional release to BB&T from escrow of existing funds in BB&T Account No. [ ] in the amount of $1,002,332.60, plus any additional interest accrued thereon, upon the earlier of Closing . . . or default by Obligors under this Stipulation, to be immediately applied by BB&T (pursuant to ¶ 5 of this Stipulation and without any consent or signed authorization of Obligors or any Escrow Agent, as defined in the Escrow Agreement, being necessary) to the indebtedness described in ¶ 3 above; and

(4) Payment by Obligors of $30,000.00, plus the management fee amount, if any, received by Obligors for September, 2010, in immediately available funds, arising out of the dispute concerning management fees relating to the Blue Heron Collateral for the months of May through September, 2010, to be held in escrow in BB&T Account No. [ ], which upon the earlier of Closing . . . or default by Obligors under this Stipulation shall be immediately applied by BB&T (pursuant to ¶ 5 of this Stipulation and without any consent or signed authorization of Obligors or any Escrow Agent, as defined in the Escrow Agreement, being necessary) to the indebtedness described in ¶ 3 above; and

(5) Obligors' joint written authorization to BB&T, permitting the unconditional release to BB&T from escrow of existing funds Certificate of Deposit No. [ ], in the amount of $208,557.26, plus any additional interest accrued thereon, upon the earlier of Closing . . . or default by Obligors under this Stipulation, shall be immediately applied by BB&T (pursuant to ¶ 5 of this Stipulation and without any consent or signed authorization of Obligors or any Escrow Agent, as defined in the Escrow Agreement, being necessary) to the indebtedness described in ¶ 3 above; and

(6) An executed estoppel letter from Blue Heron Beach Resort Community Association, Inc. evidencing that all condominium fees and assessments and other costs or charges due the Association have been paid current through August 31, 2010, and the amount of condominium fees and assessments and other costs or charges due the Association through September 30, 2010, with respect to (and clearly referencing) the Blue Heron Collateral, consisting of the units and/or folios listed on Schedule A to this Stipulation; and

(7) Payment by Obligors of $20,000.00, in immediately available funds, representing one-half of the expected September, 2010 shortfall in expenses relating to the Blue Heron Collateral, to be held in escrow in BB&T Account No. [ ], which upon the earlier of Closing . . . or default by Obligors under this Stipulation shall be immediately applied by BB&T (pursuant to ¶ 5 of this Stipulation and without any consent or signed authorization of Obligors or any Escrow Agent, as defined in the Escrow Agreement, being necessary) to the indebtedness described in ¶ 3 above. Notwithstanding anything herein or otherwise to the contrary, BB&T shall be solely responsible for all expenses, charges or costs accruing or relating to the Blue Heron Collateral from and after October 1, 2010.

*Id.* ¶ 4(a)(2)–(7) (emphasis added).

The Confidential Stipulation contains mutual releases of any claims either party may have had against the other.  *See id.* ¶¶ 6, 7.  For example, Paragraph 7 of the Confidential Stipulation provides:

> To induce Obligors to enter into this Stipulation, BB&T, itself and for each of their agents, attorneys, successors, predecessors, affiliates, members, managers, shareholders, officers, directors, heirs, personal representatives and assigns, except for the obligations set forth in this Stipulation, shall, upon the performance by Obligors of all acts (including payment and disbursement to BB&T of the full amounts, at the time and in the form) required by this Stipulation, and following the issuance of a certificate of title to the winning bidder at the foreclosure sale for the Blue Heron Collateral such that the passage of title is final, unappealable and not subject to challenge of any kind by Obligors, directly or indirectly, release Obligors and their predecessors, successors, assigns, officers, directors, shareholders, partners, employees, agents, affiliates, and attorneys, jointly and severally, in any and all capacities (whether individually, as trustee, officer, director, agent, representative, or otherwise, including as officers or directors of Blue Heron or Blue Heron Beach Resort Community Association, Inc.), from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions and causes of action for contribution and indemnity, whether arising at law or in equity (including without limitation, claims of fraud, duress, mistake, tortious interference, usury, or control), whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not asserted, for or because of or as a result of any act, omission, communication, transaction, occurrence, representation, promise, damage, breach of contract, fraud, violation of any statute or law, commission of any tort, or any other matter whatsoever or thing done, omitted or suffered to be done by Obligors, which has occurred in whole or in part, or was initiated at any time from the beginning of time up to and immediately preceding the moment of the execution of this Stipulation. BB&T agrees that the foregoing release and waiver is intended to be as broad and inclusive as permitted by the laws of the State of Florida.

*Id.* ¶ 7.  Paragraph 6 contains a parallel provision in which the Obligors release BB&T from any claims they may have against it.  *See id.* ¶ 6.

Finally, Paragraph 27 provides:

> Obligors shall, at Closing, be entitled to terminate any accounts in their name(s), including but not limited to, accounts for the following:  (i) Progress Energy; and

(ii) Federal Rent-a-Fence; notwithstanding the foregoing, BB&T shall be responsible for all bills and expenses related to such accounts accruing or relating to the Blue Heron Collateral from and after October 1, 2010.

*Id.* ¶ 27 (emphasis added).

On December 3, 2010, pursuant to the Confidential Stipulation, the parties filed a joint motion to remand their case to state court, and the next day this Court[4], entered an order granting the motion to remand. SAF ¶ 8. Pursuant to the Confidential Stipulation, the parties submitted to the state court an "Amended Agreed Final Judgment of Foreclosure" to be entered against Blue Heron as to the Blue Heron Collateral. *Id.* ¶ 9. On January 21, 2011, the state court entered the Amended Agreed Final Judgment of Foreclosure and conducted a foreclosure sale of the Blue Heron Collateral. *Id.* ¶ 10. BB&T was the highest bidder at the foreclosure sale and thereafter assigned its successful bid to its affiliated special purpose entity, Eagle FL V SPE, LLC ("Eagle SPE"). *Id.* ¶¶ 10–11. On February 4, 2011, Eagle SPE took legal title to the Blue Heron Collateral. *Id.* ¶ 11. On June 8, 2011, Eagle SPE sold the Blue Heron Collateral to an unrelated third party, BHBR Orlando, LLC ("BHBR"). Doc. 26 ¶ 13; Doc. 56-10.

### 2. *The Unpaid Blue Heron 2008–2011 Tangible Personal Property Taxes*

The Tax Collector is an elected official of Orange County acting pursuant to Article VIII of the Florida Constitution, and is responsible for collecting *ad valorem* property taxes duly assessed by the Orange County Property Appraiser. SAF ¶ 12; *see* Fla. Const. art. VIII, § 1(d). On October 11, 2011, the Tax Collector received Certificates of Correction from the Orange County Property Appraiser's office with respect to the valuation of the tangible personal property contained in the 90 units of Blue Heron Beach Resort Tower II for the years 2008–2010. Doc. 54, Affidavit of Kevin Page ("Page Aff.") ¶ 3; *id.* Ex. A. The Certificates of Correction notified the

---

[4] U. S. District Judge Patricia C. Fawsett was initially assigned this case. It was reassigned to the undersigned on October 1, 2013. *See* docket entry 49.

Tax Collector that said property had been incorrectly assessed with a taxable value of zero for each of those years, when the taxable value for each of those years should have been $1,171,810, $1,106,766, and $1,028,713, respectively. *See id.* Ex. A. The tangible personal property had previously been assessed with a taxable value of zero because Blue Heron had failed to provide tangible personal property tax returns with respect to such property for the years 2008–2010. *See* Doc. 56-2, Deposition of Fred W. Schinz, Ex. 2; Doc. 56-3, Deposition of Kevin Page, 38:11–17. With the corrections, the amount owed in taxes on the tangible personal property increased from zero for each of those years to $22,412.30, $23,732.54, and $22,343.02, respectively. *See* Page Aff. Ex. A.

In October 2011, the Tax Collector, for the first time, sent tax bills to Blue Heron for the taxes on the tangible personal property in the 90 units of Blue Heron Beach Resort Tower II for the years 2008–2010, and for 2011, as well. *Id.* ¶ 4. After the taxes remained unpaid, on May 23, 2012, the Tax Collector mailed Notices of Delinquent Taxes to Blue Heron notifying it that the 2008–2011 tangible personal property taxes were delinquent as of April 1, 2012, and that if payment was not received by June 15, 2012, the Tax Collector would take legal action to collect the delinquent taxes. *Id.*; Doc. 29-9. The taxes remained unpaid, and on June 12, 2012, pursuant to Florida law, the Tax Collector filed a petition in state circuit court to ratify and confirm warrants that the Tax Collector had issued against delinquent taxpayers for unpaid tangible personal property taxes, including the unpaid Blue Heron taxes for the years 2008–2011 (the "Petition to Ratify and Confirm Warrants"). Page Aff. ¶¶ 5–6; *id.* Ex. B. On January 9, 2013, the state circuit court entered an amended order ratifying and confirming the tax warrants for the Blue Heron 2008–2011 delinquent tangible personal property taxes, and authorizing the Tax Collector to levy and seize the tangible personal property. SAF ¶ 14; Page Aff. Ex. C.

The delinquent 2008–2011 taxes assessed against the tangible personal property in the 90 units of Blue Heron Beach Resort Tower II remain unpaid.  SAF ¶ 15.  The total amount of the unpaid 2008–2011 tangible personal property taxes as of November 2013, when the parties filed the instant motions for summary judgment, is $127,700.13, broken down as follows:  $38,805.55 for 2008; $36,285.81 for 2009; $30,945.26 for 2010; and $21,663.51 for 2011.  *Id.*; Page Aff. Ex. D.

## B.      Procedural History

On January 18, 2013, Blue Heron filed a Complaint in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, alleging claims for breach of contract and indemnity against BB&T and asserting that BB&T was responsible for the unpaid 2008–2011 tangible personal property taxes due to the Confidential Stipulation between the parties.  Doc. 2. Blue Heron alleged that it was damaged by virtue of the attorney's fees and costs it was forced to expend in defending against the Tax Collector's Petition to Ratify and Confirm Warrants.  *Id.* ¶¶ 32–33.  On March 4, 2013, BB&T filed a timely Notice of Removal in this Court, asserting diversity jurisdiction.  Doc. 1.[5]  Shortly thereafter, BB&T filed a motion to dismiss the Complaint. Doc. 4.

While BB&T's motion to dismiss was pending, the Tax Collector filed a motion seeking permission to intervene as a defendant and to file a counterclaim against Blue Heron and a crossclaim against BB&T.  Doc. 17.  The proposed counterclaim/crossclaim would seek a declaratory judgment under Florida law providing that BB&T was responsible for paying the

---

[5] Removal was timely as BB&T was served with the Complaint on February 1, 2013, *see* Doc. 1 ¶ 3, and because the 30th day following service of the Complaint was a Sunday (March 3, 2013), the time to file the Notice of Removal extended to the next day (March 4, 2013).  *See* 28 U.S.C. § 1446(b)(1); Fed. R. Civ. P. 6(a)(1).

2008–2011 tangible personal property taxes, plus interest, under the Confidential Stipulation, and that any amounts determined to be owed by BB&T to Blue Heron be paid directly to the Tax Collector up to the amount of the outstanding taxes plus interest.  *Id.*

On May 15, 2013, the Court entered an Order granting in part and denying in part BB&T's motion to dismiss and granted Blue Heron leave to file an Amended Complaint.  Doc. 23.  The Court also granted the Tax Collector's motion to intervene as a defendant.  *Id.*  The same day, the Clerk of the Court filed the Tax Collector's combined counterclaim/crossclaim for declaratory relief.  Doc. 25.

On June 12, 2013, Blue Heron filed an Amended Complaint, asserting claims against BB&T for breach of contract, indemnity, and declaratory judgment under 28 U.S.C. § 2201 based on BB&T's failure to assume responsibility for the 2008–2011 tangible personal property taxes. Doc. 29.  Blue Heron seeks as damages the attorney's fees and costs incurred both in prosecuting the instant action and in defending against the Tax Collector's Petition to Ratify and Confirm Warrants and counterclaim in this action.  After BB&T filed a motion to dismiss the Amended Complaint, the Court entered an Order denying the motion and allowing the action to proceed, finding that Blue Heron had properly stated claims for relief.  Docs. 31, 37.  The Court also found that Blue Heron was permitted to seek as damages the attorney's fees and costs it incurred in defending against the Tax Collector's Petition to Ratify and Confirm Warrants and counterclaim. Doc. 37 at 16.  However, the Court struck Blue Heron's request in its breach of contract claim for attorney's fees resulting from Blue Heron's *prosecution of this action against BB&T*, finding that Blue Heron was not entitled to such fees.  *Id.* at 16–17, 22.  The Court also struck Blue Heron's

request in its claim for declaratory judgment that BB&T be held responsible for such fees. *Id.* at 21–22. The instant motions for summary judgment followed. Docs. 53, 56, 58.[6]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48. A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248. In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Id.* at 255.

---

[6] After the motions for summary judgment were filed, the Court entered an Order directing Blue Heron to show cause why the case should not be dismissed for lack of diversity jurisdiction. Doc. 106. Upon review of Blue Heron's response, the Court determined that it had diversity jurisdiction over the case and discharged the previous Order. Docs. 108, 110.

III.     **DISCUSSION**

A.      **Blue Heron's Breach of Contract Claim**

In Florida, the elements of a claim for breach of contract are:  (1) a valid contract; (2) a material breach; and (3) damages.  *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th Dist. Ct. App. 2003).  In this case, there is no dispute that the Confidential Stipulation served as a valid contract.  Rather, the parties disagree as to whether BB&T breached the Confidential Stipulation, which would entitle Blue Heron to damages in the form of attorney's fees and costs incurred in defending against the Tax Collector's Petition to Ratify and Confirm Warrants and counterclaim.  Resolution of this issue depends on the interpretation of the following portion of Paragraph 4(a)(7) of the Confidential Stipulation:  "Notwithstanding anything herein or otherwise to the contrary, BB&T shall be solely responsible for all expenses, charges or costs accruing or relating to the Blue Heron Collateral from and after October 1, 2010."  Confidential Stipulation ¶ 4(a)(7).  Blue Heron and the Tax Collector argue that the 2008–2011 delinquent tangible personal property taxes assessed against the personal property in the 90 units of Blue Heron Beach Resort Tower II are costs "accruing or relating to the Blue Heron Collateral" *after* October 1, 2010, and that BB&T breached the Confidential Stipulation by failing to assume responsibility for the payment of these taxes.  *See* Doc. 53 at 11–18; Doc. 58 at 17–25.  BB&T, on the other hand, contends that such taxes, at least for the years 2008–2010, are costs "accruing or relating to the Blue Heron Collateral" *before* October 1, 2010, and that Blue Heron is therefore responsible for the payment of these taxes.  *See* Doc. 56 at 10–15.[7]

The interpretation of a contract is generally a question of law for the court.  *Barone v. Rogers*, 930 So. 2d 761, 764 (Fla. 4th Dist. Ct. App. 2006).  "Nevertheless, when the terms of the

---

[7] As explained herein, BB&T also denies that it is responsible for the 2011 taxes.

contract are ambiguous, susceptible to different interpretations, parol evidence is admissible to 'explain, clarify or elucidate'" the ambiguous term or phrase. *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st Dist. Ct. App. 2001) (quoting *Friedman v. Va. Metal Prods. Corp.*, 56 So.2d 515, 517 (Fla. 1952)). "The initial determination of whether the contract term is ambiguous is a question of law for the court, and, if the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law. However, where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Id.* (citations and internal quotation marks omitted); *see also Barone*, 930 So. 2d at 764 ("[W]here the wording of an agreement is ambiguous, its interpretation involves questions of fact, precluding summary disposition.").

For several reasons, the Court finds that the Confidential Stipulation is ambiguous as to which party was responsible for the 2008–2010 tangible personal property taxes. First, by using the phrase "accruing or relating", the Confidential Stipulation leads to conflicting results. The Florida Supreme Court has explained that "in its elementary sense the word 'or' is a disjunctive participle that marks an alternative generally corresponding to 'either' as 'either this or that'; a connective that marks an alternative." *Rudd v. State ex rel. Christian*, 310 So. 2d 295, 298 (Fla. 1975) (citations omitted). Nonetheless, "[t]here are, of course, familiar instances in which the conjunctive 'or' is held equivalent to the copulative conjunction 'and', and such meaning is often given the meaning 'or' in order to effectuate the intention of the parties to a written instrument . . . when it is clear that the word 'or' is used in the copulative and not in a disjunctive sense." *Id.* (citations omitted). Such a construction is preferred "when a construction based on the strict letter

of the [contract] would lead to an unintended result and would defeat the evident purpose of the [contract]."  *Id.* (citations omitted).

Reading the phrase "accruing or relating" in the disjunctive requires the Court to examine the terms "accruing" and "relating" separately.  *See Rudd*, 310 So. 2d at 298.  Under such a construction, the 2008–2010 tangible personal property taxes unquestionably "related" to the Blue Heron Collateral from and after October 1, 2010, even if they "accrued" to the Blue Heron Collateral before then, and even if they also "related" to the Blue Heron Collateral before then, because they remained unpaid after that date.  However, whether the taxes "accrued" to the Blue Heron Collateral before October 1, 2010 requires an examination of Florida law.

In Florida, tangible personal property taxes are "assessed according to [the property's] just value" on January 1 of each year, and the taxes become "due and payable on November 1 of each year or as soon thereafter as the certified tax roll is received by the tax collector."  Fla. Stat. §§ 192.042(2), 197.333.  BB&T argues that the 2008–2010 personal property taxes "accrued" on January 1, 2008, January 1, 2009, and January 1, 2010, respectively, because those are the dates that the taxes were assessed.  Doc. 56 at 12.  Blue Heron and the Tax Collector, on the other hand, contend that the taxes did not "accrue" until they became due and payable when the Tax Collector received the Certificates of Correction from the Orange County Property Appraiser's office in October 2011.  Doc. 53 at 15–16; Doc. 58 at 20.  BB&T has the better argument.  The term "accrue" means "[t]o come into existence as an enforceable claim or right."  Black's Law Dictionary (9th ed. 2009).  The Tax Collector undoubtedly had an enforceable claim or right with respect to the tangible personal property taxes on the Blue Heron Collateral as of January 1 of each year, regardless of the fact that the taxes did not become "due and payable" until the Tax Collector received the Certificates of Correction, because January 1 is the date upon which the property

owner becomes liable for the taxes.  Indeed, a first-priority lien on the property arises as of that date. Fla. Stat. § 197.122(1).  Furthermore, Florida law provides that "[a]ll owners of property are held to know that taxes are due and payable annually and are responsible for ascertaining the amount of current and delinquent taxes and paying them before April 1 of the year following the year in which taxes are assessed."  *Id.*  As such, a legal obligation to pay taxes is imposed on the property owner regardless of whether the owner actually knows that an amount is owed.[8]

This Court's conclusion as to when taxes "accrue" to tangible personal property under Florida law is consistent with the Fifth Circuit's decision in *Union Trust Co. v. Tomlinson*, 355 F.2d 40, 43 (5th Cir. 1966).[9]  In *Tomlinson*, the Fifth Circuit held that Florida's intangible personal property tax "accrued" on a decedent's estate as of January 1, because that was the date the tax was assessed under the relevant statute and became an "absolute liability" of the estate, rather than November 1, when the taxes became "due and payable."  355 F.2d at 43.  Other decisions of the Fifth Circuit, binding on this Court, also point to January 1 as the date that the taxes "accrued" to the Blue Heron Collateral.  *See Texas Trailercoach, Inc. v. Comm'r of Internal Revenue*, 251 F.2d 395, 401 (5th Cir. 1958) ("'When the right to receive an amount becomes fixed, the right accrues.'") (quoting *Spring City Foundry Co. v. Comm'r of Internal Revenue*, 292 U.S. 182, 184– 85 (1934)); *Frost Lumber Indus. v. Comm'r of Internal Revenue*, 128 F.2d 693, 694 (5th Cir. 1942) (stating the rule "that an item accrues for purposes of taxation when all events have occurred necessary to fix the liabilities of the parties and to determine the amount of such liabilities").

---

[8] The fact that the tangible personal property taxes were assessed in a "back assessment", years after they should have been assessed, is immaterial, as Florida law provides that a back assessment "shall have the same force and effect as it would have had if it had been made in the year in which the property shall have escaped taxation."  Fla. Stat. § 193.092(1).

[9] In *Bonner v. Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Indeed, in denying BB&T's second motion to dismiss in this case, the Court recognized that the 2008–2010 personal property taxes "accrued" to the Blue Heron Collateral prior to October 1, 2010 because the taxes were assessed on January 1 of each year. Doc. 23 at 8; *see also* Doc. 37 at 14. Accordingly, the Court finds that the 2008–2010 tangible personal property taxes "accrued" to the Blue Heron Collateral on January 1 of those respective years.

Thus, the 2008–2010 tangible personal property taxes were "related" to the Blue Heron Collateral *after* October 1, 2010, but they "accrued" to the Blue Heron Collateral *before* October 1, 2010. This is problematic under both a disjunctive and conjunctive reading of the phrase "accruing or relating", because it would seemingly make BB&T responsible for *all* expenses, thereby rendering meaningless the parties' use of the phrase "from and after October 1, 2010".

Blue Heron and the Tax Collector dispute that this construction renders the phrase "from and after October 1, 2010" meaningless, pointing out that the Confidential Stipulation was not executed until well after October 1, 2010. Doc. 70 at 6–7. Thus, in their view, the date was used as a "line of demarcation", after which Blue Heron would have no further obligations with respect to the Blue Heron Collateral, *regardless of when the obligations accrued or were related to the Blue Heron Collateral*. Doc. 53 at 14–15; Doc. 58 at 19. BB&T, on the other hand, argues that Paragraph 4(a)(7) was intended to make BB&T responsible only for those obligations which accrued or related to the Blue Heron Collateral on or after October 1, 2010. Doc. 56 at 12–13. In the order denying BB&T's motion to dismiss, the Court opined that the relevant phrase— "[n]otwithstanding anything herein or otherwise to the contrary, BB&T shall be solely responsible for all expenses, charges or costs accruing or relating to the Blue Heron Collateral from and after

October 1, 2010"[10]—is reasonably susceptible to either BB&T or Blue Heron's interpretation. Doc. 37 at 15. The Court explained that "it is unclear whether October 1, 2010 was intended to be the date on which BB&T was to become solely responsible for all expenses relating to the Blue Heron Collateral, no matter when such expenses were initially assessed or accrued, or whether October 1, 2010 and after was intended to serve as the date on which expenses must have accrued or related to the Blue Heron Collateral for BB&T to be responsible for such expenses." *Id*. The Confidential Stipulation does not contain language that definitively clarifies which interpretation is the correct one. Accordingly, the Confidential Stipulation is ambiguous as to which party was responsible for pre-October 1, 2010 taxes, and the Court may therefore look to parol evidence in deciphering the parties' intent. *Strama*, 793 So. 2d at 1132.

The evidence regarding the parties' intent as to liability for pre-October 1, 2010 taxes is conflicting. Christopher Hinsley, an attorney who was BB&T's primary draftsman for the Confidential Stipulation, acknowledged at his deposition that the intent of Blue Heron's attorneys in negotiating the Confidential Stipulation was to "absolve Blue Heron and its guarantors and affiliates from all liability of the property of any kind." Doc. 59-2, Deposition of Christopher Hinsley at 29:13–15, 41:10–20. Hinsley testified that BB&T's intent, on the other hand, was "to limit exposure to expenses, charges and costs related to the Blue Heron Collateral and the [phrase] [']from and after October 1, 2010['] was an attempt to effectuate that limitation." *Id*. at 42:5–9. Hinsley testified that, as such, he believed that BB&T was not responsible for "[h]istorical expenses," only those which accrued on or after October 1, 2010. *Id*. at 42:10–22. Accordingly,

---

[10] Paragraph 27 contains similar language: "Obligors shall, at Closing, be entitled to terminate any accounts in their name(s), including but not limited to, accounts for the following: (i) Progress Energy; and (ii) Federal Rent-a-Fence; notwithstanding the foregoing, BB&T shall be responsible for all bills and expenses related to such accounts *accruing or relating to the Blue Heron Collateral from and after October 1, 2010*." Confidential Stipulation ¶ 27 (emphasis added).

there is conflicting evidence as to the parties' intent regarding liability for pre-October 1, 2010 taxes.  Because a reasonable jury could believe either Blue Heron or BB&T's interpretation, there is a genuine issue of material fact as to which party should be liable for the 2008–2010 tangible personal property taxes.  Accordingly, summary judgment on Blue Heron's breach of contract claim is inappropriate with respect to those taxes.

With respect to the 2011 tangible personal property taxes, however, summary judgment in favor of Blue Heron and the Tax Collector is warranted.  It is clear that the 2011 tangible personal property taxes did not "accrue" or "relate" to the Blue Heron Collateral prior to October 1, 2010, as they were not assessed until January 1, 2011, and therefore BB&T assumed responsibility for such taxes.  BB&T, however, argues that it is not liable for the 2011 tangible personal property taxes because it sold the Blue Heron Collateral to its special purpose entity, Eagle SPE, in February 2011, and Eagle SPE then sold the Blue Heron Collateral to an unrelated third party in June 2011.  Doc. 56 at 15–19.  To the contrary, the 2011 tangible personal property taxes on the Blue Heron Collateral "accrued" on the date of assessment, January 1, 2011, when Blue Heron still owned the property, and BB&T cannot absolve itself of its contractual duty to assume liability for these taxes from Blue Heron by selling the property to a third party.  Contrary to BB&T's argument, such a conclusion does not create "never-ending" liability for BB&T with respect to the tangible personal property taxes on the Blue Heron Collateral.  Rather, a third party, BHBR, became the owner of the Blue Heron Collateral in June 2011, making it (or whichever entity owned the property as of January 1, 2012) responsible for the tangible personal property taxes which accrued to the property beginning January 1, 2012.  Accordingly, BB&T breached the Confidential Stipulation by failing to assume responsibility for the 2011 tangible personal property taxes.  As a result, Blue Heron suffered damages in the form of attorney's fees and costs incurred in defending against the Tax

Collector's Petition to Ratify and Confirm Warrants and counterclaim with respect to such taxes.[11] Blue Heron is therefore entitled to summary judgment on its breach of contract claim with respect to the 2011 tangible personal property taxes.

### B. Blue Heron's Indemnity Claim

In its indemnity claim, Blue Heron asserts that BB&T has a duty to indemnify it for the attorney's fees and costs incurred in defending against the Tax Collector's Petition to Ratify and Confirm Warrants and counterclaim. Doc. 29 ¶¶ 41–52. "Indemnity is a right which inures to one who discharges a duty owed by him, but which, as between himself and another, should have been discharged by the other, and is available only where the whole fault is in the one from whom indemnity is sought." *Horowitz v. Laske*, 855 So. 2d 169, 174 (Fla. 5th Dist. Ct. App. 2003) (citing *Houdaille Indus., Inc. v. Edwards*, 374 So. 2d 490, 492–93 (Fla. 1979)). The right of indemnity may arise either by contract or under common law due to the violation of a duty as between tortfeasors. *Carlson Corp./Se. v. Sch. Bd. of Seminole Cnty., Fla.*, 778 F. Supp. 518, 520 (M.D. Fla. 1991) (citations omitted); *Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1077 (Fla. 5th Dist. Ct. App. 2003). "[C]ommon law indemnity is an equitable remedy that arises out of obligations imposed through special relationships, but *contractual indemnity* is not concerned with 'special relationships' or vicarious, constructive, derivative or technical liability; it is concerned with the express terms of the agreement to indemnify." *Camp, Dresser & McKee*, 853 So. 2d at 1077 (emphasis added). Thus, "[i]n cases involving contractual indemnity, the terms

---

[11] As the Court previously noted, Florida's "wrongful act" doctrine permits a plaintiff to recover third-party litigation expenses as damages when the defendant's wrongful act has caused the plaintiff to litigate with a third party. *See* Doc. 37 at 16 (citing *State Farm Fire & Cas. Co. v. Pritcher*, 546 So. 2d 1060, 1061 (Fla. 3d Dist. Ct. App. 1989); *Northamerican Van Lines, Inc. v. Roper*, 429 So. 2d 750, 752 (Fla. 1st Dist. Ct. App. 1983)).

of the agreement will determine whether the indemnitor is obligated to reimburse the indemnitee for a particular claim." *Id.*

In this case, Blue Heron does not assert that its right to indemnity arises under common law.  Rather, Blue Heron contends that its right to indemnity arises from Paragraphs 4(a)(7) and 27 of the Confidential Stipulation.  Doc. 29 ¶¶ 41–52; Doc. 67 at 17–19.  Those provisions contain the now-familiar language that BB&T would be responsible for expenses "accruing or relating to the Blue Heron Collateral from and after October 1, 2010."  However, there is nothing in this language—or anywhere else in the Confidential Stipulation—indicating that BB&T would *indemnify* Blue Heron for any such expenses, or that it would *defend and hold harmless* Blue Heron from such expenses.  And Florida cases recognizing a contractual duty to indemnify require express language providing for indemnification.  *See, e.g.*, *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 643 (Fla. 1999) (holding that summary judgment was inappropriate where there was a disputed fact issue as to whether an agreement's express indemnity clause—which provided that the indemnitor would "defend and hold harmless" the indemnitee—was intended to cover the school board's actions or a marching band's actions); *Sch. Bd. of Broward Cnty. v. Pierce Goodwin Alexander & Linville*, No. 4D11-4808, 2014 WL 1031461, at *7 (Fla. 4th Dist. Ct. App. Mar. 19, 2014) ("Indemnity contracts are subject to the general rules of contractual construction . . . and must be construed based on the express intentions of the parties.") (citations and internal alterations omitted).  As such, as a matter of law, Blue Heron has failed to establish a claim for indemnity.  The Court will therefore grant summary judgment to BB&T and deny summary judgment to Blue Heron on this claim.

### C.    Blue Heron's Claim for Declaratory Relief

Federal law provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and

other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Because a declaratory judgment may be issued only in the case of an "actual controversy", there must be a "substantial continuing controversy" between adverse parties. *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999).

In this case, Blue Heron requests a declaratory judgment under 28 U.S.C. § 2201 providing that (i) BB&T is responsible for the 2008–2011 tangible personal property taxes and (ii) that BB&T must compensate Blue Heron for the attorney's fees and costs incurred by Blue Heron in defending against the Tax Collector's Petition to Ratify and Confirm Warrants and counterclaim. Doc. 29 at 14–18. The Court has previously held that these are legitimate bases for a declaratory judgment because they involve a continuing controversy, *see* Doc. 37 at 21, and BB&T does not challenge this conclusion. BB&T's only argument is that Blue Heron's declaratory judgment claim must fail because the Court should not hold BB&T responsible for the 2008–2011 tangible personal property taxes. Doc. 56 at 21. However, the Court has now determined that BB&T is responsible for the 2011 tangible personal property taxes, and that Blue Heron is entitled to attorney's fees and costs incurred in defending against the Tax Collector's Petition to Ratify and Confirm Warrants and counterclaim with respect to such taxes. *See supra*, Part III.A. Moreover, the Court has determined that there is a genuine issue of material fact as to liability for the 2008–2010 tangible personal property taxes. *See id*. Accordingly, BB&T's Motion for Summary Judgment must be denied with respect to Blue Heron's claim for declaratory relief. For the same reasons, Blue Heron's Motion for Summary Judgment will be granted in part and denied in part with respect to this claim.

### D. The Tax Collector's Counterclaim and Crossclaim for Declaratory Relief

The Tax Collector's request for declaratory relief arises under Florida's declaratory judgment statute, Fla. Stat. § 86.011 *et seq.*, rather than the federal statute. Doc. 25 at 4. The

Florida statute provides that "[a]ny person claiming to be interested or who may be in doubt about his or her rights under a . . . contract, . . . or whose rights, status, or other equitable or legal relations are affected by a statute . . . or by . . . contract, . . . may have determined any question of construction or validity arising under such statute [or] contract, . . . and obtain a declaration of rights, status, or other equitable or legal relations thereunder."  Fla. Stat. § 86.021.  Florida's declaratory judgment statute "is substantive law intended to be remedial in nature, and is to be liberally administered and construed."  *Marco Island Cable, Inc. v. Comcast Cablevision of the South, Inc.*, 509 F. Supp. 2d 1158, 1160 (M.D. Fla. 2007) (citing Fla. Stat. § 86.101; *Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 10–12 (Fla. 2004)).

In its counterclaim/crossclaim, the Tax Collector seeks a declaratory judgment that BB&T is responsible for paying the 2008–2011 tangible personal property taxes, plus interest, under the Confidential Stipulation.  Doc. 25 at 5–6.  Because the Court has concluded that BB&T is responsible for paying the 2011 taxes, but that there is a genuine issue of material fact as to liability for the 2008–2010 taxes, partial summary judgment is appropriate on the Tax Collector's counterclaim/crossclaim for declaratory relief.

The Tax Collector has also requested that any amounts determined to be owed by BB&T to Blue Heron be paid directly to the Tax Collector up to the amount of the outstanding taxes plus interest.  Doc. 25 at 5–6.  The basis of the Tax Collector's argument is a Florida statute providing that a tax warrant that has been ratified and confirmed by a court pursuant to Florida law has the legal effect of a writ of garnishment.  *Id.* (citing Fla. Stat. §§ 197.413(8), 77.06(1)).  Both Blue Heron and BB&T stated that they have no objection to the Tax Collector's request.  Doc. 65 at 2 n.1; Doc. 68 at 8.  Accordingly, the Court will grant summary judgment to the Tax Collector on this issue.

IV.     **CONCLUSION**

For the aforementioned reasons, the motions for summary judgment will be granted in part and denied in part.  As no genuine issues of material fact exist, Blue Heron is entitled to a judgment in its favor on its claims for breach of contract and declaratory relief with respect to the 2011 tangible personal property taxes.  Similarly, BB&T is entitled to a judgment in its favor on Blue Heron's claim for indemnity.  And the Tax Collector is entitled to a judgment in its favor on its counterclaim/crossclaim for declaratory relief to the effect that BB&T is responsible for paying the 2011 tangible personal property taxes, and that any amounts ultimately determined to be owed by BB&T to Blue Heron must be paid directly to the Tax Collector up to the amount of the outstanding taxes plus interest.  This case will proceed to trial on the issue of which party—Blue Heron or BB&T—is responsible for the 2008–2010 tangible personal property taxes under the Confidential Stipulation.

Accordingly, it is hereby **ORDERED**:

1.      Blue Heron's Motion for Summary Judgment (Doc. 58) is **GRANTED in part and DENIED in part** as set forth in this Order.

2.      BB&T's Motion for Summary Judgment (Doc. 56) is **GRANTED in part and DENIED in part** as set forth in this Order.

3.      The Tax Collector's Motion for Summary Judgment (Doc. 53) is **GRANTED in part and DENIED in part** as set forth in this Order.

4.      A Declaratory Judgment will be entered by separate Order of the Court, upon the conclusion of this litigation.

**DONE** and **ORDERED** in Orlando, Florida on June 12, 2014.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties